et al. And we have Mr. Yan. You reserve two minutes for rebuttal, and you can begin whenever you're ready, Mr. Yan. Thank you. Good morning, Your Honor. I'm sorry. I'll stand in the middle. Okay. Good morning, Your Honor. May I please call, my name is David Yan. I represent plaintiffs in Appellant's case. There's several issues before this court. First, the question is whether or not this court should allow Defense Counsel to conclude outcome of these litigations. And as you know, there's a record shows that Defense Counsel has never implemented any litigation hold. They tried to shift the burden of the litigation hold to the plaintiff counsels. In the record, they claim that the plaintiff did not really ask for any specific records. However, we filed a notice of claim timely, very early in the stage of the litigation. The litigation hold that was placed early, though, the request was for video relating to Mr. Zhang's death, right? Correct. It's about the hold. I believe that there's an internal investigation. They already reviewed the telephone recordings that we did not know these kind of investigative report until later stage of the litigations. But I thought that your complaint now is that they didn't save all the video for the entire time that Mr. Zhang was in the prison facility. Is that correct? That's one of the argument. We just only need the relevant video surveillance clips in the area where decedent Zhang lived. So I guess my question is, though, for that entire period, how was the other side supposed to that they were supposed to, in your view, keep all the video ever of his movements about? I mean, would they have to figure out when he was in a cell, when he was going to eat, when he was in the yard? Would they have had to track all the video to find him in all of their... Presumably, it's not just one camera. It's many, many cameras, right? Your Honour, in Rox Island or in other detention facilities, that's all these detainees, inmates, supposed to live in very restricted areas. No, I know. But is it just one camera or are there multiple cameras covering multiple areas? There are multiple cameras. So did you want them to save all the video feed of every camera where he might have been since he arrived at Rikers? No, no. It's about, that's only if you see that the defendants, their affidavit, one of the defendants, the technical person, saying that only required 15 staff hours to preserve the area where the detainee Zhang lived. We don't need 4.5 million hours. Well, that would presume, though, that they would have saved all the footage regardless of whether he was in there at that area, right? Hours and hours, I mean, a year of video tape? Your Honour, there's a reason they should preserve these. No, no, no. I'm asking for the scope, not the reason why. Are you saying that it would have taken them very few hours to just preserve literally all the video for the entire period that he was at Rikers for every area where he might have been? Not every areas. Where he might have been. That's supposed that he might be. That's my MRJD is not supposed to be because he was only detained in a very restricted area where he lived and slept. That's only we required. And they could, based on defendants' internal investigation, they said that they will only need a full 15 staff hours to stop and export these video clips. And also there's another area, Your Honour, that's the telephone recordings. They never meaningfully object to any preservation request to keep these telephone recordings. From the first day, their retention policy is about 18 months to maintain these telephone recordings. There isn't any kind of technical difference. I don't want you to spend all your time on the recordings. Let me just focus you on the record that we have, assuming there is no issue or fault with respect to the recordings. In the record, we have two complaints by your client of chest pains, right? One on June 9th of 2015. They give him an EKG. They do an x-ray imaging. It's normal. The symptoms are consistent with inflammation. And then three months later, September 5th, 2015, he presents with chest pains. They perform an EKG on site. They note he has risk factors for heart disease. And then they transfer him to Lincoln Hospital where they do a cardiac workup. They determine he's not experiencing a myocardial infarction. And they don't refer him for any additional treatment. They don't do a stress test. They don't recommend a stress test to the prison. So, as you know, the standard for deliberate indifference is very high. How is that deliberate indifference when they sent him to the hospital? The tests at the hospital don't show any issues. And the hospital doesn't do a stress test and doesn't recommend a stress test. Maybe it's negligent. Maybe they should have done one. But deliberate indifference is a pretty high standard. Your Honor, I agree with your concern about it. The standards are very high. However, the internal report that's in the records in that, they should have referred the patient or to see them to the stress test. And also that's in our... Was Lincoln Hospital then negligent or deliberate indifference? They didn't do a stress test. They didn't recommend a stress test. Hospital, that's only for casualty. They just test. No any kind of emergency. They send the patient back to the detention cell. However, the internal investigation after the patient passed away, they found, oh, we should have referred the patient to the stress test. Then they knew that there was delay of the treatment. Delay of treatment can constitute deliberate indifference. And for the lower court, it's for the issue findings, not for issue determinations. The way in treatment would be if he had chest pains and they didn't do anything, then you would have a different case. You'd have someone presenting with chest pains and they ran no tests. They did nothing. They just waited. That's not what we have here. The two times that he presented with chest pains, they did something, right? That's the issue about when the defense counsel intentionally let the ESI be deleted. And so if the telephone recordings from day one to end preserved, the decedent spoke to his friends, families, talk about he felt pain, and we had a medical record, did not even mention this. There's a question about the reliability of this medical record. That's also the complaints. But if an EKG was unremarkable, why would you give a stress test? EKG is probably unremarkable. However, I believe that's the internal investigation, internal review report. It's not about the choice of the treatment. You are making a claim about the choice of the treatment. You say they should be liable because they didn't give a stress test. And they gave him an EKG, which, you know, as I said, the record seems, and correct me if I'm wrong, says was unremarkable. Similarly, if they refer to the EKG, they find, oh, that's probably unremarkable. However, it's not by choice of the treatment. It's about when you see that's a very serious medical issues. The whole case is about the choice of the treatment. Your Honor, it's not by the choice of treatment. It's about whether or not there's a delay in treatment, whether or not they should have referred the decedent to the stress test. And based on the medical expert report, when somebody, because there's some risk factors for coronary arterial disease, you see these risk factors. But they treated the risk factors. He had cholesterol, right, high blood pressure. They gave him medication and he refused to take it, right? So they were treating the risk factors, right? Yes, Your Honor, that's the issue. Your client didn't want to take the medication. Yes, Your Honor, this is about a defense argument saying, oh, this guy, you refuse to take the medications. You refuse to have the treatment. However, if we have the telephone recordings, he told his fellow inmates saying that. How is it relevant that he was talking to his family or other inmates? I don't understand how that would affect anything if he didn't tell the medical providers. So I don't know why you're talking about whether he would have talked to his family. Your Honor, that's a question about the validity and the reliability of medical records. I don't understand that. These ones, okay, that's one example. He's, the decedent signed up for sick course. However, he signed up for the pen to the heart. However, he was treated for hand pain. That's the one, even there was no any notation to the encounter about his chest pain. And one of the Jose, the Dr. Jan San Jose, treated his decedent's hand pain without even mentioning about his chest pain. All right. All right. We understand the argument. You have your two minutes for rebuttal and we'll hear from the city of New York. Thank you. Good morning, Your Honors. May it please the court. Hannah Sirocco for the appellees. I'd like to start just very quickly correcting the records. Could you move the microphones a little closer to your speaker? I'm having trouble hearing you. Thank you very much. Keep your voice up. Of course. Apologies. I'd like to start just quickly correcting the records. There are a few misstatements by my colleague just to clarify with the preservation of evidence here. There was substantial evidence that was preserved initially, so the claim that there's no preservation is incorrect. It's undisputed that the Department of Correction preserved, in this case, all of the medical records, the video footage from the date of the decedent's death, preserved that even before there was a request for it, as well as the inmate file, staff schedule. So there was substantial preservation here. I'd also quickly like to note that this here isn't 15 hours. As the magistrate judge below noted, the 15 hours number was for nine cameras out of 2,000 over a 90-day period. So the actual number of hours that would have been required just to preserve and extract and review the video footage for the facilities that Mr. Zhang was incarcerated in would have been over 400 workdays total. So it's not a matter of just 15 hours. That was a very limited number. We're talking about 2,000 cameras here in the two facilities. Do you know whether the 15-hour number, does that refer to just if they had exported literally all the video without sorting it out? Do you know where the 15-hour number comes from? I believe it was exporting the extracting and preserving, extracting, and reviewing. I believe it was. Of only nine cameras? Just the nine cameras. Of just nine cameras. Any vicinity of his cell? Or what nine cameras are those? It was nine cameras within the facility. I don't believe the record specifies which nine cameras, but there were 2,000 total. And again, there were very varying requests here. At some point, it was just the date of death. At other times, there were specific dates. Then it was the entire year. And then, I believe, 90 days at one point. So that 15-hour number was for nine cameras for the 90 days preceding, I believe, the notice of claim. So I just wanted to clarify that quickly. Turning to the deliberate indifference issue here, as Your Honors already noted, essentially what appellant's claims boil down to here is a disagreement over the treatment that a stress test should have been ordered. But this Court has long been very clear that a disagreement about treatment, even potential medical malpractice, does not meet the exacting standard of a deliberate indifference claim. And what the record here does reflect, as Your Honors noted, there are actually extensive efforts to diagnose, to treat, to monitor Mr. Zeng's risk factors for heart disease. His high blood pressure, his high cholesterol. He's repeatedly not compliant with those medications. But there were repeated efforts to counsel him on compliance. Repeated testing for his cholesterol and blood levels. Also tried alternative lifestyle recommendations. There were multiple efforts here. And on the only two occasions when Mr. Zeng presented to a medical facility and complained of chest pain, those complaints were taken very seriously. The correction officers called for emergency medical staff to come to Mr. Zeng. He was treated at the clinic on June 9th with multiple tests done. Found to be a rib inflammation issue. And then on September 9th, or September 5th, 2015, he was transferred to the hospital for additional testing. And the hospital did not refer or recommend any additional treatment beyond the normal EKGs, the normal blood work that came back. So the record really reflects here our extensive efforts by defendants to treat, to diagnose, to treat, to monitor Mr. Zeng's health issues as were presented to medical staff. The record also shows that the visits after September 5th, he never again complained of chest complaints. He may have mentioned pain in his, I believe, one of the inmates stated that he complained of pain in his, sort of between his heart and his arm, shoulder pain. But what he presented to medical staff was pain in his shoulder. He was diagnosed with tuberculosis. There's nothing in the record disputing that diagnosis. Hand pain, which he said had been going on for years. The shoulder pain for a month. None of those are indicative of a cardiac issue. And so the only two times that a complaint of chest pain was made to medical staff, it was treated promptly and seriously. There was some evidence of a complaint, at least an inmate said there was a complaint to a correctional officer of chest pain. And then nothing happened as a result of that, right? I believe so. It's a bit unclear from that inmate's testimony. He mentions that he told one correctional officer who spoke some dialect of Chinese that Zhang was complaining of pain between his heart and his arm. That he may further clarify later in his deposition that he would be sort of working out his shoulder going like this. But what the record shows is that that correctional officer then helped him get to a sick call appointment, helped him get to the clinic. But then once actually at the clinic in that March appointment, he complained of shoulder pain. There's no indication that he complained of any chest pain. And that's when he was diagnosed with, I believe when he was diagnosed with the tendinitis in his shoulder. So that one complaint, he received prompt medical attention. There are no further questions, Your Honor. We ask for support. All right. Thank you. Mr. Yan, you have your two minutes in rebuttal. Your Honor, the court had a question about relevance. Nine cameras versus 2,000 cameras. There's no need for 2,000 cameras to capture the inmates in every area. Actually, the inmate could not go to every area. He could only sleep in one of the cells. Nine cameras, that'd be more than enough. Nine cameras for 90 days could preserve and export these kind of images about the decedent. Also, the lower court never engaged in the proportionality analysis about telephone recordings. If telephone recordings be preserved, then there's issue about after June 5th, after September 5th, 2015, the decedent did complain about the chest pains. And inmates corroborated his complaint about chest pains. He may refer to correctional officers. He may help him to sign up for sick leave. However, these did not really review in the medical record. There's a question about validity and reliability of the medical record. It's a question for jury to decide. It's not a question for the lower court to decide. The lower court is for issue findings. It's not for issue determinations. And it's a defense argument saying that after September 5th, 2015, decedent never again complained any chest pain. It's contradictory to the records before this court. Decedent did complain. He complained to his family friends. He complained to his fellow inmates. If he's alive today, he could take the stand to testify. However, we need the telephone recording to really present these complaints. It was the defendant had the knowledge, the information about the decedent's complaints. He made a complaint about chest pain. It's the delay in treatment that constitutes deliberate indifference. All right. Thank you. All right. Thank you both for reserved decision. Have a good day.